FILED

2006 Jun-20  PM 12:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | |
|---|---|
| BILL KEY, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )  6:04-cv-00199-JEO |
| v. | ) |
| | ) |
| JOHN MARK TIREY, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

Bill Key, Jr., maintains this action, brought under 42 U.S.C. § 1983, asserting various claims against Walker County Sheriff's Deputies Tommy Hood, Ralph B. Williams, Jr., Darryl Mote, Berry Hogan, Darren Bridges, Danny Terry, Chuck Wright, Mike Holcomb, and Mike Knowles (hereinafter "the defendants") in their individual capacities for violation of the plaintiff's rights under the Fourth Amendment.[1]  Specifically, he asserts that the defendants used excessive force by "beating and assaulting" his son while he was in the defendants' custody. (Complaint (Doc. 1 at p. 4)).[2]  The case is before the court on the defendants' motion to strike various affidavits submitted by the plaintiff (doc. 75) and on the defendants' motion for summary judgment (doc. 66).[3]  Upon consideration of the same, the court finds that the motions are due to be granted in part and denied in part.

---

[1]This action was originally brought by Donnie Ray Key, who is now deceased.  His father and administrator of his estate, Bill Key, Jr., has been substituted as the party in this case.  However, hereinafter, "the plaintiff" refers to Donnie Ray Key.

[2]References herein to "Doc.___" are to the documents in the clerk's record in this matter.

[3]Each is accompanied by a supporting brief.  (Doc. 67 & 76).

## I.  FACTS

### A.  Procedural History

Donnie Ray Key originally brought this action on January 30, 2004, against Sheriff John Mark Tirey of Walker County, Alabama, and Deputy Sheriffs Darryl Mote, Berry Hogan, Darren Bridges, Tommy Hood, and Ralph B. Williams, Jr., in both their official and individual capacities alleging that they violated the plaintiff's Fourth Amendment rights by wrongfully establishing a road block, wrongfully arresting, handcuffing and detaining him, and by using excessive force upon him.  (Complaint at p. 4).  The plaintiff also asserted state law claims of wantonness, negligence, carelessness or unskillfulness, negligent supervision, false arrest, false imprisonment and assault and battery.  (*Id*. at pp. 5-9).

On February 24, 2004, the defendants, except Tommy Hood and Ralph B. Williams, Jr. (who had not been served at that point), filed a motion to dismiss the complaint.  (Doc. 8).  On July 12, 2004, this court (1) dismissed with prejudice the § 1983 claims against all the defendants in their official capacities; (2) allowed the § 1983 claim against the defendant deputies in their individual capacities concerning their purported use of excessive force to proceed; (3) dismissed with prejudice the plaintiff's § 1983 claims against Sheriff John Tirey in his individual capacity; (4) dismissed with prejudice the plaintiff's state law claims against all the defendants; and (5) allowed the plaintiff's claim for punitive damages on the remaining § 1983 claim (concerning excessive force) to remain against the defendant deputies in their individual capacities.  (Doc. 20).

After consenting to the jurisdiction of the undersigned magistrate judge (doc. 21), the plaintiff, on January 19, 2005, filed a motion to amend his complaint adding as parties four

reserve deputies of the Walker County Sheriff's department "that either participated in the incident made the basis of this lawsuit, or had first hand knowledge of same, and stood idly by and made no efforts to stop the abusive conduct." (Doc. 29). The motion was granted by this court on January 29, 2005, and an amended complaint was filed adding as defendants deputies Mike Holcomb, Mike Knowles, Danny Terry, and Chuck Wright.[4] (Doc. 30). The defendants, all represented by the same counsel, moved for dismissal of the amended complaint. (Doc. 32). Following various and numerous motions regarding discovery, the plaintiff, on March 31, 2005, moved to amend the complaint a second time in order to add a conspiracy count against the defendants.[5] (Doc. 37). After the defendants' motion to dismiss the amended complaint was filed (doc. 40), this court held that the defendants' previous motion to dismiss was mooted by the filing of the second amended complaint by the plaintiff and the defendants' new motion to dismiss. On August 1, 2005, this court issued a memorandum opinion and order granting in part and denying in part the defendants' motion to dismiss. (Doc. 60 & 61). That order (1) dismissed the § 1983 claims against all the defendants (including the reserve deputies) in their official capacities; (2) allowed the § 1983 claim against the defendant deputies in their individual capacities concerning their purported use of excessive force to proceed; (3) dismissed the plaintiff's state law claims against all the defendants; (4) struck and dismissed the plaintiff's claims for punitive damages against all the defendants in their official capacities; (5) dismissed the plaintiff's conspiracy claim in the second amendment to the complaint; and (6) allowed the

_____

[4]The plaintiff's counsel adopted the allegations in the original complaint and added four paragraphs regarding the conduct of the reserve deputies. (Doc. 30).

[5]The plaintiff's counsel adopted the allegations in the original complaint and the first amended complaint and added a single paragraph alleging a conspiracy. (Doc. 37).

plaintiff's remaining § 1983 claim (concerning excessive force) to the extent it seeks punitive damages against the deputy defendants in their individual capacities. (Doc. 60). After filing an answer and amended answer to the second amended complaint (doc. 62 & 63), the defendants filed the instant motion for summary judgment on September 16, 2005, along with a memorandum of law and evidentiary materials. (Doc. 66, 67 & 68). The plaintiff filed a response to the defendants' motion for summary judgment on October 11, 2005, including a memorandum of law and evidentiary materials. (Doc. 70, 71 & 72).[6] The defendants filed a reply brief (doc. 73), along with supplemental evidentiary materials (doc. 74). The defendants also filed a motion to strike certain evidentiary submissions of the plaintiff (doc. 75) and a supporting brief (doc. 76). The plaintiff did not file anything in response to the defendants' motion to strike.[7]

## B. Plaintiff's Allegations[8]

The plaintiff asserts that on February 2, 2002, he approached a roadblock or checkpoint set up by Walker County Sheriff's Department Deputies Mote, Hogan, Williams, Hood, and Bridges and reserve deputies Holcomb, Knowles, Terry, and Wright. Realizing that he did not have his driver's license, he panicked and drove through the checkpoint. (Complaint at ¶ 10).

When he failed to stop, the deputies followed him. After about one mile, the plaintiff pulled his car to the side of the road and was immediately surrounded by deputies with drawn

---

[6]Document 71 is a duplicate filing of document 70.

[7]In his response to the motion for summary judgment, he did assert that any challenges to any hearsay evidence would be unfounded in that the statements would be "present sense impression" and "excited utterance" exceptions. (Doc. 70 at p. 16).

[8]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Ins. Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

weapons. (Complaint at ¶ 12). Because he was afraid for his life, he did not get out of the car, but rather placed both hands on the steering wheel and rolled down the window on the driver's side. (*Id*. at ¶ 13). The plaintiff asserts that he was then immediately pulled through the driver's side window, thrown to the ground and punched, kicked, and beaten by each of the Sheriff's Deputies and at least one of the reserve deputies. (*Id*. at ¶ 13; Doc. 30).

The plaintiff was then placed in the back seat of a sheriff's vehicle, where defendant Hogan got into the back seat with him and "tongue lashed" the plaintiff with cursing and other "derogatory obscenities." (Complaint at ¶ 14). Deputy Hogan then removed the plaintiff from the back of the vehicle and made him apologize to the other deputies. (*Id*. at ¶ 15).

The plaintiff was then taken to the Walker County Jail and charged with reckless endangerment. (Doc. 74 at Ex. A). His family posted bond for him and immediately took him to the hospital for treatment of his injuries, which included "a broken nose, one tooth knocked out, three holes to the back of the head, both eyes swollen shut, not being able to swallow for being choked, and other extensive bruises, mental anguish and emotional distress." (Complaint at ¶ 16).

## II.  MOTION TO STRIKE

### A.  Generally

The defendants have moved to strike portions of the affidavits submitted by the plaintiff in support of his opposition to the defendants' motion for summary judgment. (Doc. 75). The defendants assert that exhibits K through O of the plaintiff's submission (doc. 72) should be "stricken in whole or in part because: (a) they do not comply with the provisions of Rule 56(e); (b) they are not based on personal knowledge; (c) they contain hearsay; (d) they contain

5

conclusory statements; and (e) they are shams designed to create a false issue of fact."  (Doc. 75).

As previously stated, the plaintiff has not responded specifically to the defendants' motion.  Therefore, the first issue is whether the plaintiff, by his failure to respond, has conceded the defendants' motion and whether the court should grant the motion without further consideration.  The Eleventh Circuit Court of Appeals has held that a plaintiff who is late in responding to a motion or who does not respond at all faces serious consequences.  *See Mosley v. MeriStar Management Co., LLC*, 137 Fed. Appx. 248, 2005 WL 1489320 (11th Cir. 2005) (lower court's decision to strike the plaintiff's opposition and accompanying affidavits to a motion for summary judgment was not an abuse of discretion when it was filed late and there was no explanation for the tardy filing).  Out of an abundance of caution and recognizing that the court must address the merits of the motion to strike, it will treat the terse references in the response to the motion for summary judgment as his response to the defendants' motion to strike.

Rule 56(e) of the FEDERAL RULES OF CIVIL PROCEDURE provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein....

FED. R. CIV. P. 56(e).  Inadmissible evidence that cannot be reduced to admissible form at trial may not be used when considering a motion for summary judgment.  *Denny v. City of Albany*, 247 F.3d 1172, 1189 (11th Cir. 2001) (citing *Prichard v. Southern Company Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)) (inadmissible hearsay cannot be used to defeat summary judgment when that hearsay will not be reducible to admissible form at trial); *see also Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775 (11th Cir. 2004) ("[i]nadmissible hearsay generally cannot be considered on a motion for summary judgment").  Hearsay testimony can be

6

considered in a motion for summary judgment if it could be offered at trial under any exception to the hearsay rules. *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999). The Eleventh Circuit has consistently held in the context of summary judgment that "conclusory allegations without specific supporting facts have no probative value." *United States v. Trainor*, 376 F.3d 1325, 1334 n.5 (11th Cir. 2004) (citing *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).

Contradictory statements in an affidavit may be stricken when in conflict to prior testimony in a deposition. The Eleventh Circuit in *Van T. Junkins v. U.S. Industries*, *Inc.*, 736 F.2d 656, 657 (11th Cir. 1984), stated that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Junkins*, 736 F.2d at 657. More particularly, in *Van T. Junkins*, the plaintiff brought an action against the manufacturer of prefabricated buildings to recover for alleged fraud and reckless misrepresentations in denying the plaintiff a dealership after he purchased land and a building. During his deposition, the president of the plaintiff company testified three times that there was no condition attached to his purchasing the building. *Junkins*, 736 F.2d at 657. On the motion for summary judgment, the president stated in an affidavit that he had a meeting with representatives of the defendant who told him that if he would purchase one of their buildings then he would be awarded the dealership. *Id*. Affirming the trial court's grant of summary judgment for the defendant, the court stated:

> Under these facts as presented, we agree with the district court that the affidavit constituted a sham. When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that

party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

(*Id*.).  In *Tippens v. Celotex Corp*., 805 F.2d 949, 953-54 (11th Cir. 1986), the court stated:

> A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.  "An opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility." 6 Moore's Federal Practice ¶ 56.15[4] (2d ed. 1985) (footnote omitted).

> The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended.  To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth.  Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.  Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.  An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins* at 657.

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence.  *See Choudhry v. Jenkins*, 559 F.2d 1085, 1090 (7th Cir.) (summary judgment was improper even though party's testimony was "not a paradigm of cogency or persuasiveness," since it was not a "transparent sham"), *cert. denied sub nom*., *Indiana v. Choudhry*, 434 U.S. 997, 98 S. Ct. 634, 54 L. Ed. 2d 491 (1977).  In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.  *Kennett-Murray*, *Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980).

The foregoing authorities demonstrate that the court should be cautious in rejecting testimony.  However, if an individual has made statements in an affidavit that contradict prior specific testimony in a deposition, they are due to be stricken.

## B.  Affidavit of Bill Key, Jr. (Ex. K)[9]

The defendants initially contend that the affidavit of Bill Key, Jr., is due to be struck "because it fails to meet the requirements set forth in Rule 56(e) and (g) of the FEDERAL RULES OF CIVIL PROCEDURE in that (1) it is not based on personal knowledge; (2) it contains inadmissible conclusory statements; (3) it is composed almost entirely of hearsay statements that are inadmissible; and (4) portions of it directly contradict his deposition testimony and are therefore due to be stricken as a sham."  (Doc. 76 at p. 2).

### 1.  No Personal Knowledge

The defendants first claim that Bill Key, Jr.'s, affidavit should be stricken because he has no personal knowledge of the events to which he attests.  In his affidavit, he begins by stating that he "make[s] this affidavit on personal knowledge of the facts below and from a face to face conversation with my son the morning after the incident . . . ."  (Ex. K at ¶ 2).  In his deposition, he testified as follows:

> Q.  Other than what your son told you about this incident that occurred out there, do you have any other source of knowledge, has anybody ever told you anything else about what happened?
>
> A.  No, sir.

(Bill Key Dep. at p. 31).[10]

> Q.  So, everything you've learned from this incident, basically, you've learned from your son?
>
> A.  I've learned from my son.

---

[9]Bill Key's affidavit is located at document 72, exhibit K.

[10]Bill Key's deposition is located at document 72, exhibit C.

(*Id*. at p. 42).

Bill Key, Jr., and his wife, Joyce Key, were at their cabin in Greene County the night of the incident in question.  (Joyce Key Dep. at p. 23).[11]  It is clear that any information that Bill Key, Jr., has concerning the events of the night in question came from conversations with his son.  Therefore, any statements made by Bill Key, Jr., indicating that he had any first-hand knowledge of the events of that night in regard to his son, are due to be stricken.  However, any statements that Mr. Key made in regard to what he personally observed, such as the resulting injuries to his son, are allowed.

In the second paragraph of the affidavit, Mr. Key states, "where he [(the plaintiff)]was beaten by the Walker County Deputies, Sunday February 3, 2002."  (Ex. K at ¶ 2).  The defendants assert that it is due to be stricken because it implies that Mr. Key had personal knowledge of the events.  His deposition testimony cited above demonstrates the absence of such knowledge.  The statement is due to be struck.  In the fifth paragraph of his affidavit, he similarly states, "where one of the deputies sat on his chest."  (*Id*. at ¶ 7).  It also is due to be struck for the same reason.

## 2.  Hearsay Statements

The defendants next assert that the following statements in Key's affidavit are due to be struck because they are inadmissible hearsay:

(2) . . . when he informed me that he was assaulted and beaten after failing to stop at a road block on Fall City Road, Jasper Alabama.

(3)  . . . as he explained each and every injury to me as I asked him what happened.  He told me that he was not under the influence of any drugs or alcohol

---

[11]Joyce Key's deposition is located at document 72, exhibit D.

10

at the time this incident occurred.  As a matter of fact, the reason he was out, he said he was going to get a six pack of beer.

(4) . . . the emergency room doctor explained [at one of the depositions] that the weight of my son was one-hundred and thirty six pounds . . . .

(5) . . . .  He informed me that he passed out because he could not breathe.

(6) My son swore to me and indicated that just about every one of the deputies that was at the road block participated in the beating.

(7) My son informed me that one deputy held him around his neck and someone else sat on his chest.  He said that he felt that he was going to die, and indicated to me that he passed out . . . .

(Ex. K at ¶¶ 2-7).

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted.  FEDERAL RULES OF EVIDENCE 801(c).  While hearsay is not admissible, statements that are hearsay can otherwise be made admissible if they fall under one of the listed exceptions.  *See* FED. R. EVID. 803, 804 & 807.

The statements listed above are unquestionably hearsay.  They are statements made by one other than the declarant and they are offered to prove the truth of the matter asserted, such as the fact that the plaintiff was beaten by the deputies and that he was not under the influence of any drugs or alcohol.  As previously noted, the only response to these arguments the court has to evaluate the same is the plaintiff's conclusory assertion in the response to the defendants' motion for summary judgment.  He states that all the statements made by Donnie Ray Key's family members should all be considered Rule 803 exceptions to the hearsay rule because they are "present sense impressions" or "excited utterances."  (Doc. 71 at p. 16).

A "present sense impression" is defined as: "A statement describing or explaining an

11

event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." FED. R. EVID. 803(1).  The underlying theory of this exception is that the "substantial contemporaneity of the event and the statement negate the likelihood of deliberate or conscious misrepresentation." *United States v. Scrima*, 819 F.2d 996, 1000 (11th Cir. 1987).  Since the statements were made to Mr. Key the following day (Bill Key Dep. at p. 16), they do not fall under the hearsay exception as being a "present sense impression."  They were neither made while the declarant was perceiving the events nor immediately after.

An "excited utterance" is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." FED. R. EVID. 803(2).  To be deemed an "excited utterance," the court must find (1) that a startling event or condition happened, (2) that the statement was made by the person while under the stress of excitement of the event, and (3) that the stress of excitement was caused by the event or condition.  *United States v. Ledford*, 154 Fed. Appx. 692, 698, 2005 WL 3047956 at *6 (10th Cir. 2005) (unpublished).  The key to determining whether a statement qualifies as an "excited utterance" is the phrase "while under the stress of excitement" of the event.  While stress and excitement will attenuate over time, determining when the person is no longer under the requisite stress or excitement is difficult and different for each individual.  Even an "out-of-court statement made at least fifteen minutes after the event it describes is not admissible [as a hearsay exception] unless the declarant was still in a state of excitement resulting from the event." *United States v. Carlisle*, 2006 WL 777862 at *4 (11th Cir.) (unpublished) (quoting *United States v. Cain*, 587 F.2d 678, 681 (5th Cir. 1979)).  In *Carlisle*, the court held that statements made to paramedics and an officer shortly after a shooting were "excited utterances."

12

*Id.*  The court stated, "It stands to reason that being shot by one's spouse would create

'significant distress' that might linger more than just a few minutes."  *Id.*  The Tenth Circuit, in

*Ledford*, 154 Fed. Appx. at 700, 2005 WL 3047956 at *7, held that "there is no precise amount

of time between the event and the statement beyond which the statement cannot qualify as an

excited utterance."  That court further laid out the relevant considerations as to the time

requirement for "excited utterances" as follows:

> [C]ourts, including this one, have repeatedly held that time lapse alone is not
> dispositive.  *See United States v. Farley*, 992 F.2d 1122, 1123, 1125-26 (10th Cir.
> 1993) (noting a statement by a young child made the day following molestation
> could have been admitted as an excited utterance where the child was described as
> frightened and on the verge of tears at the time of the disclosure); *see also United
> States v. Rivera*, 43 F.3d 1291, 1296 (9th Cir. 1995) (holding a statement made a
> half hour after an assault occurred qualified as an excited utterance and stating
> that "[r]ather than focusing solely on the time a statement was made, we consider
> other factors, including the age of the declarant, the characteristics of the event
> and the subject matter of the statements."); *United States v. Iron Shell*, 633 F.2d
> 77, 85-86 (8th Cir. 1980) (holding the amount of time between the startling event
> and the statement is only one factor to be weighed by the court in determining
> whether the excited utterance exception to the hearsay rule applies).

*Ledford*, 154 Fed. Appx. at 700, 2005 WL 3047956 at 8.

In this case, it is clear that Donnie Ray Key experienced a "startling event" while being

apprehended and arrested.  However, while the time lapse between when the startling event

occurred and when Bill Key spoke with the plaintiff is not exact, it was at least the day following

his arrest and following Bill Key's return from Greene County.  (Bill Key Dep. at p. 16).  Key

has provided no evidence to suggest that when the plaintiff spoke with him, he was still under the

excitement of the events that had taken place the night before.  There is no evidence that he was

nervous, afraid, or otherwise unsettled so as to qualify the statement as admissible.  Therefore,

these hearsay statements do not fall under the "excited utterance" exception and must be struck

and excluded from further consideration.

### 3. Conclusory Statements

The defendants next assert that Bill Key also made several conclusory statements based upon information that he had received, either from others, personal observations, or a combination of both. These statements include the following to which the defendants object:

> (4) . . . I knew that it would not take six to eight deputies to subdue an unarmed man the weight and size of Donnie.

> (5) He showed me his *broken* nose . . . .

(Doc. 72, Ex. K) (italics added).

When determining whether a statement is conclusory and due to be excluded when deciding a motion for summary judgment, the question is whether the statements are supported sufficiently by facts. *See Trainor*, 376 F.3d at 1334, n.5. In this case, the first statement, concerning the number of deputies it would take to contain the plaintiff, is conclusory. Therefore, the statement is due to be stricken.

With regard to the second statement, particularly the reference to the plaintiff's nose being "broken," the defendants argue that this is again an unsupported conclusory statement. During his deposition, Dr. Christopher G. Endfinger, M.D. (hereafter "Endfinger"), stated that "there was a head CT done, which revealed a possible nasal bone fracture . . . . (Endfinger Dep. at p. 11).[12] He further stated that "[f]or a nondisplaced nasal fracture, which this would almost certainly have had to have been, if it is a true fracture because it's questionable on the CT scan . . . ." (*Id*. at p. 22). The radiology report from Walker Baptist Medical Center, where Dr.

---

[12]Endfinger's deposition is located at document 72, exhibit H.

14

Endfinger is employed and the plaintiff was initially treated was signed by Dr. Kenneth J. Hagler, M.D., and indicates that there was a "[n]asal fracture of indeterminate age."  (Doc. 68, Ex. O). Given that one physician who reviewed the results of the CT scan found that there was possibly a nasal bone fracture and another who found that there was in fact one - but could not determine the age of the fracture, the court finds that the statement is conclusory as to Mr. Key and due to be struck.  He does not have the requisite training or experience to make such a statement.[13]

### 4.  Contradictory Statements

The defendants also claim that portions of Bill Key, Jr.'s, affidavit directly contradict his deposition testimony and therefore those portions are due to be stricken.  (Doc. 76 at p. 2). However, the defendants do not specify which statements are contradictory and should be struck on this basis.  Therefore, this portion of the motion is due to be denied.

### C.  Affidavit of Endfinger, M.D. (Exhibit L)

The defendants next claim that the affidavit of Endfinger is due to be stricken because (1) portions of it contain hearsay statements that are inadmissible, (2) portions of it are not based on personal knowledge, and (3) the affidavit directly contradicts his deposition testimony and is therefore due to be stricken as a sham.  (Doc. 76 at p. 5).

### 1.  Hearsay Statements

The defendants claim that the fourth paragraph of Endfinger's affidavit contains hearsay testimony that does not fall under any exception to the hearsay rule.  Paragraph (4) states:

> (4) I treated him for a broken nose, a busted lip, a left ankle sprain, an
> abrasion to the head, swelling behind the [sic] one of his ears, chest pain, and

---

[13]However, the court does not find the absence of this evidence consequential in view of the other medical records and testimony.

bruises from [sic] as he reported being beaten and assaulted by the Walker County
Sheriff Department deputies.

(Doc. 72, Ex. L at ¶ 4).  The phrase "he reported being beaten and assaulted by the Walker

County Sheriff Department deputies" is what is at issue.

FEDERAL RULES OF EVIDENCE 803(4) provides:

> Statements made for purposes of medical diagnosis or treatment and
> describing medical history, or past or present symptoms, pain, or sensations, or
> the inception or general character of the cause or external source thereof insofar as
> reasonably pertinent to diagnosis or treatment.

While the defendants correctly cite to *In Re Moore*, 165 B.R. 495 (M.D. Ala. 1993), for the

proposition that "statements of fault or identity are not ordinarily available," *Moore* stands for

much more.  The use of the word "ordinarily" is the key.  *Moore* adopts a two-part test for

determining the admissibility of hearsay statements that are related to medical diagnosis or

treatment under Rule 803(4) that was articulated by the Eighth Circuit Court of Appeals.  It

stated, "first, the declarant's motive in making the statement must be consistent with the

purposes of promoting treatment; and second, the content of the statement must be such as is

reasonably relied on by a physician in treatment or diagnosis."  *In Re Moore*, 165 B.R. at 498

(quoting *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985)).  The Eighth Circuit has

also stated that "[i]n general, a patient's statement describing how an injury occurred is pertinent

to a physician's diagnosis and treatment."  *United States v. Gabe*, 237 F.3d 954, 957-58 (8th Cir.

2001).  This two-prong test was applied by the Fourth Circuit Court of Appeals in *Willingham v.

Crooke*, 412 F.3d 553 (4th Cir. 2005).  In *Willingham,* the court found that a statement made by a

patient to her physician where she described an officer pointing a gun at her was a statement

made in the course of "diagnosis and treatment" because she was also being treated for emotional

16

trauma.  *Willingham*, 412 F.3d at 562.

In this case, Endfinger stated in his deposition:

A.   In these type of situations where there's a police altercation or an assault, and I don't know what the circumstances are, you know, I frequently choose not to put a patient like [sic] on a narcotic pain medication.  It might contaminate any kind of drug test that is done in the future, or I don't know if the patient might have a problem with substance.

So, if they don't have a severe injury, then I frequently will just have them take Tylenol or Advil for pain, unless there's a severe injury like a fracture, and then I just give them the pain medication, and down the road, they'll have to deal with that.

Q.   Under these circumstances, regardless of whether there was an altercation with the police, would you have prescribed a narcotic-type of pain reliever to Mr. Key?

A.   It's possible that I might have prescribed one.  If the circumstances were different.  If a patient tells me that – apparently, he related to me that he had run a roadblock.

(Endfinger Dep. at pp. 55-56).  The plaintiff informed Endfinger about his altercation during the diagnosis and treatment phases of his visit.  Thus, this statement meets the first prong of the *Renville* test.  It is also clear from the foregoing testimony that Endfinger relied on the plaintiff's statements describing the event, including how the injuries were inflicted, in determining, in part, how to treat the plaintiff.  He stated in his deposition that he treated patients involved in police altercations or assaults differently than those who were not.  (Endfinger Dep. at pp. 55-56).  For instance, he stated that he might have prescribed different medications had the defendant not indicated that he had been in an altercation with the police.  *Id*.  Because Endfinger appears to have relied on the plaintiff's statement that he had been beaten by Walker County Sheriff's Department deputies, the statement meets the second prong of the *Renville* test and may be

17

reduced to admissible form at trial.  Therefore, it may be considered in determining the present motion.[14]

### 2.  Personal Knowledge

The defendants state that the seventh paragraph of Endfinger's affidavit is due to be stricken because it is not based on personal knowledge.  It states, "I fully assumed that he was telling the truth about the assault for I had no reason not to believe him.  (Doc. 72, Ex. L at ¶ 7).  The defendants assert that the statement is not made on personal knowledge because it is made on an assumption and Endfinger stated that he could not really remember the patient in his deposition.  (Endfinger Dep. at p. 10).  This statement, to the extent it is a comment on the veracity of the plaintiff is due to be struck.

### 3.  Contradictory Statements

The defendants next claim that two statements by Endfinger in his affidavit are contradictory to statements in his deposition and should be considered a sham and stricken.  In the second paragraph of his affidavit, Endfinger states, "I make this affidavit on personal knowledge of the facts stated below and from an examination of Donny [sic] Ray Key conducted, on or about February 2, 2002."  (Doc. 72, Ex. L at ¶ 2).  The defendants assert that this is contradictory to his deposition testimony where he testified that he could not really remember the patient and could not remember how the patient "presented himself."  (Endfinger Dep. at p. 10).

The doctor had access to and had reviewed the plaintiff's medical records during the deposition, which was taken some time before the affidavit was prepared.  It is possible that these

---

[14]The weight to be given such a statement is left for the jury in the usual case.  The court notes that even if this statement were excluded, it would not alter the court's determination of the motion for summary judgment.

documents could have refreshed his memory enough that he did in fact remember examining the plaintiff at the time of the affidavit.  In addition, while the second paragraph is poorly worded, it can be read to mean that the knowledge he speaks of comes from the medical records themselves and not from his memory.  In any case, the contradiction, if any, does not rise to the level of being considered a sham and, therefore, is not due to be stricken.[15]

The defendants also assert that the phrase "I personally examined and treated Donnie Ray Key," found in the third paragraph of Endfinger's affidavit should be stricken as a sham statement.  (Doc. 72, Ex. L at ¶ 3).  The medical records of Donnie Ray Key, along with the deposition of Endfinger clearly show that Endfinger did examine and treat the plaintiff. (Endfinger Dep. at p. 9; Doc. 68 at Ex. O).  Just because Endfinger did not immediately remember the plaintiff out of the many patients he treats each year does not mean that the statement is untrue or offered merely in a attempt to create an issue of material fact where there was none.  There was no dispute that Endfinger examined and treated the plaintiff before the affidavit was executed, and there is none now.  The defendants' motion to strike this phrase is therefore due to be denied.

The defendants further assert that Endfinger's statement in the fourth paragraph, where he provides that he treated the plaintiff for a broken nose, is contradictory to his testimony in his deposition and should be struck.  (Doc. 72, Ex. L at ¶ 4).  The defendants offer portions of Endfinger's testimony as proof of a contradiction.  The defendants' brief in support of the motion states:

> However, in his deposition, he testified that there was no definite fracture of

---

[15]These are more appropriate for impeachment.

> Donnie Ray Key's nose, that it would not surprise him if there was no fracture,
> that he did not remember Donnie Ray Key complaining about his nose, and that
> he did not prescribe any medication for Donnie Ray Key's nose.

(Doc. 76 at p. 7).   However, the defendants have taken Endfinger's statements somewhat out of context.   A careful reading of Endfinger's deposition revels that Endfinger later qualified the phrase "definite fracture" as follows:

> The nasal fracture on the head CT, apparently, it just said a questionable nasal
> bone fracture, which means it was not a *grossly* displaced one, one that they
> would call a definite fracture.  Like I mentioned, a nasal bone fracture, unless the
> fracture is displaced, there is no specific treatment for it.

(Endfinger Dep. at p. 21) (emphasis added).   Therefore, in stating that there was not a "definite fracture," he was speaking in specific medical terms and not stating that there "definitely was no fracture" as the defendants assert.   Furthermore, when Endfinger stated that it would not surprise him that there was no fracture, he was merely responding to a hypothetical question posed by the defendants.  (*Id*. at p. 26).   He was not stating that there was, in fact, no fracture, as the wording of the defendants' motion implies.   He appears to have been stating how difficult nasal fractures that are not grossly displaced are to diagnose.   Additionally, the radiology report from Walker Baptist Medical Center (signed by Dr. Kenneth J. Hagler, M.D.) indicates that there was a "[n]asal fracture of indeterminate age."  (Doc. 68, Ex. O).   Under the circumstances, the statement of Endfinger is not due to be struck.   To the extent that Endfinger states that he did not remember the plaintiff complaining about his nose (Endfinger Dep. at p. 26), this is not so contradictory as to preclude consideration of the statements.

The statement from Endfinger's deposition offered by the defendants where Endfinger states that he did not prescribe any medication for a fractured nose (Endfinger Dep. at p. 16) is

20

also not contradictory.  This is clearly not contradictory to Endfinger's statement in his deposition that the plaintiff's nose was broken.  Endfinger's reluctance to prescribe any medication to the plaintiff was discussed earlier.

### D.  Affidavit of Joyce Key (Exhibit M)

The defendants next assert that the affidavit of Joyce Key is due to stricken because (1) it is not based on personal knowledge, (2) it contains inadmissible conclusory statements, and (3) it is composed almost entirely of hearsay statements that are inadmissible.  (Doc. 76 at p. 8).

### 1.  No Personal Knowledge

The defendants assert that Joyce Key's affidavit should be stricken because she had no personal knowledge of the events attested to.  In her affidavit, she states that she made the "affidavit on personal knowledge of the fact [sic] stated below and from my discussion and dialogue with my son about the beating incident."  (Doc. 72, Ex. M at ¶ 2).  In her deposition, Joyce Key testified as follows:

> Q.  So, is it fair to say that everything you know about this case, as far as what happened at the scene, is based on what Donny [sic] Ray told you?
>
> A.  Yes, sir, and then the hospital reports.
>
> Q.  Yes, ma'am, and what they may have said in court?
>
> A.  Uh-huh.

(Joyce Key Dep. at p. 47).[16]

It is clear that any information that Joyce Key has concerning the events on the night in question came from conversations with the plaintiff.  Therefore, any statements made by Joyce

---

[16]Her deposition is located at document 72, exhibit D.

Key indicating that she had any first-hand knowledge of the events of that night in regard to her son are due to be stricken.  However, any statements that Joyce Key made in regard to what she personally observed, such as the resulting injuries to the plaintiff, are due to be considered.

### 2.  Hearsay Statements

The defendants assert that "[t]his affidavit is composed almost entirely of hearsay that does not fall within any exception to the hearsay rule."  (Doc. 76 at p. 9).  A review of the affidavit by the court demonstrates that the following statements are excludable "hearsay" that do not fit within an exception.

> (3) . . . he later informed me about being beaten by the Walker County Sheriff Department Deputies on the night before.

> (4) . . . he immediately informed me that the deputies beat him after he had failed to stop at a road block.  He said his nose was broken, his chest was sore and his lip was busted and, He [sic] had a possible broke ankle.

> (7) . . . he informed me that he went through the road block and after a brief chase, he stopped on Musgrove Road.  He finally stuck his hand [sic] out the window and they [sic] deputies jerked him out through the window and started beating him.

> (8) . . . Donny [sic] informed me that the deputies placed him in the back seat of the car and one of them got in the back seat and asked if he wanted some more.

(Doc. 72, Ex. M at ¶¶ 3-4, 7-8).

As discussed previously concerning the testimony of Bill Key, Jr., the plaintiff, in his response to the defendants' motion for summary judgment, argues that all statements made by the plaintiff's family should qualify as exceptions to the hearsay rule and be admitted as evidence because they were either "present sense impressions" or "excited utterances."  (Doc. 71 at p. 16).  Because the plaintiff's statements to his mother, Joyce Key, were made the day following the

incident (Joyce Key Dep. at p. 25), they do not fall under the hearsay exception as a "present sense impression."  They further do not fall under the "excited utterances" exception to the hearsay rule and are therefore due to be stricken for the reasons previously stated.  The plaintiff has provided no evidence to suggest that when he spoke with his mother, he was still under the excitement of the events that had taken place the night before.  Therefore, the hearsay statements offered by Joyce Key in her affidavit do not fall under the "excited utterance" exception to hearsay.  They are due to be struck.

### 3.  Conclusory Statements

The defendants next assert that the word "battered" which is used by Joyce Key in the third paragraph of her affidavit is an inadmissible conclusory statement and is due to be stricken. The defendants contend that Joyce Key is not a physician and has no medical expertise, training, or special knowledge on which to rely in stating that her son was "battered."  (Doc. 76 at p. 10). The court does not find the term "battered" to be a medical term reserved for only those with medical expertise, training, or other specialized knowledge.  Without more, the court finds that the word is simply descriptive of the condition she observed.  The defendants' motion as it relates to the use of the word "battered" is due to be denied.

### E.  Affidavit of James Wilkerson (Exhibit N)

The defendants assert that the affidavit of James Wilkerson (hereinafter "Wilkerson") is due to be struck because (1) it is not based on personal knowledge, (2) it contains inadmissible conclusory statements, and (3) it is composed almost entirely of inadmissable hearsay.  (Doc. 76 at p. 10).

23

### 1.  Personal Knowledge

According to the defendants, Wilkerson's affidavit should be stricken because he had no personal knowledge of the events.  In his affidavit, he states that he made the "affidavit on personal knowledge of the facts stated below and from my own conversation and dialogue with my brother in law-in [sic]."  (Doc. 72, Ex. N).  In his deposition, Wilkerson testified:

> Q.  Right.  You didn't see anything happen there though, you weren't there to see it?
>
> A.  No, sir, I was not there.
>
> Q.  What I am asking about is not the injuries, not what you may have seen when you got to the jail.  You didn't see anybody hit or kick or punch Donny [sic] Ray, did you?
>
> A.  I never seen the first lick swung.  I never seen the first kick kicked.
>
> Q.  So, anything you know about what happened between the deputies and Donny [sic] Ray is based on what Donny [sic] Ray told you, or did somebody else tell you something that they know?
>
> A.  That's it.

(Wilkerson Dep. at p. 66).

It is clear that any information that Wilkerson has concerning the events prior to taking the plaintiff from the jail came from statements made by the plaintiff to him.  Therefore, they are not based on his personal knowledge.  They are, however, based on the plaintiff's observations and perceptions that were relayed to Wilkerson.  Thus, the plaintiff has the requisite personal knowledge of the events and Wilkerson has the ability to state how he came to be aware of the information.  Therefore, the dispositive question is whether the statements constitute exceptions

to the hearsay rule.[17]

## 2. Hearsay Statements

The defendants next argue that the statements in Wilkerson's affidavit are inadmissible because they are hearsay. The plaintiff counters that they should be admitted as "present sense impressions" or "excited utterances." (Doc. 71 at p. 16). The relevant portions of the affidavit provide as follows:

(6)     Donnie Key informed [me] that they (deputies) drug him out of his car through a partially closed widow, then stomped him and beat him. They handcuffed him and knocked him to the ground. They kicked him in the groin area and dared him to get up . . . .

(7)     I was the one who took Donnie to the hospital, over Donnie['s] objection, to get treatment for his injuries. Donnie also informed me that two of the deputies involved, [sic] told him to forget it, (Forget [sic] about the beating) and they wouldn't proceed with charges against him.

(8)     Donnie was afraid, frightened and scared and did not want his father and mother to find out about what had happened. He told me he was also afraid for his own safety because the two deputies indicated that "let it go, or they would catch him soon[er] or later again . . . .

(Doc. 72, Ex. N).[18]

Because the court has already determined that there was a startling event for purposes of Rule 803(2) and because there is no serious question that the statements relate to that event, the pertinent question of admissibility concerns whether the plaintiff was under the stress of excitement from the event at the time the statements were made.[19] The defendants assert that this

---

[17]Wilkerson is able to testify as to what he personally observed, such as the injuries to the plaintiff.

[18]This same information is contained in Wilkerson's deposition. (See Wilkerson Dep. at p. 38). The defendants have not moved to strike this testimony.

[19]The court does not find these statements to be "present sense impression[s]" under Rule 803(1).

evidence is "blatant and obvious hearsay" that "does not fall within any exception to the hearsay rule." (Doc. 76 at p. 12). They also note that the plaintiff's death "will not bring [the otherwise] hearsay statements within any exception to the hearsay rule." (*Id.*).

In *United States v. King*, 221 F.3d 1353, 2000 WL 1028228 (10th Cir. 2000) (unpublished), the court stated that "[t]here is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance. '[T]he standard of measurement is the duration of the state of excitement.' FED. R. EVID. 803(2) advisory committee's note. '[T]he character of the transaction or event will largely determine the significance of the time factor.'" *Id.* "Rule 803(2) rests on the theory that the agitated mind is much less likely to engage in conscious fabrication than the reflective mind." *Ledford*, 154 Fed. Appx. at 700.

The arrest report in this case states that the plaintiff was arrested at 10:57 p.m. (Doc. 74, Ex. AA). The Walker County Jail commitment and release sheet shows that the plaintiff was released at 1:23 a.m. (*Id.* at Ex. CC). Wilkerson stated in his deposition that he did not see or speak to the plaintiff until he was released. (Wilkerson Dep. at p. 32). Therefore, the earliest that Wilkerson could have spoken with the plaintiff was about two and one-half hours after the incident took place. The statements made to Wilkerson described the arrest of the plaintiff.

From immediately after the incident occurred until his release from custody, the plaintiff was under the control of the Sheriff's deputies. Thus, for nearly two and one-half hours, the plaintiff was in the hands of those involved in or closely associated with the assault. It is not a setting that is likely to reduce the stress of the situation. This is evidenced by the fact that Wilkerson states in his affidavit that when he picked the plaintiff up at the jail, he was "afraid,

26

frightened and scared and did not want his father and mother to find out about what had happened."  (Doc. 72, Ex. N at ¶ 8).  The plaintiff also told Wilkerson that he was "afraid for his own safety because the two deputies indicated that [he should] 'let it go, or they would catch him soon[er] or later again.'"[20]  (*Id*.).  The court is satisfied under the circumstances that the plaintiff still was in a sufficient "state of excitement" for the statements to Wilkerson to qualify as "excited utterances."  In sum, at this juncture, the court finds that the plaintiff experienced a traumatic, physical event; that he sustained physical injuries; and the surroundings and situation left insufficient time for reflection so as to preclude consideration of the statements.[21]

### 3.  Conclusory Statements

The defendants assert that four statements in Wilkerson's affidavit are due to be struck because they are inadmissible conclusory allegations.  These include Wilkerson's statements that (1) he saw an imprint of a boot on the plaintiff's groin, (2) the plaintiff could hardly walk, (3) the plaintiff was afraid, frightened, and scared, and (4) it took the plaintiff two weeks to recover from his injuries.  (Doc. 76 at p. 13).

In regard to the first statement, the defendants contend that Wilkerson is not a medical professional, nor does he explain what expertise, training, or special knowledge on which he relies in concluding that there was a boot print on the plaintiff's groin.  (*Id*. at p. 13).  None of the specialized training that the defendants assert is necessary to determine if a mark is a boot print is actually required.  A lay person can observe a surface and offer his or her best judgment of

---

[20]The two deputies are not identified.

[21]In reaching this conclusion, the court has not ignored the deposition testimony of Charles Parr that the plaintiff told him shortly after the incident that he was planning "on suing the officers because they beat him up."  (Parr Dep. at pp. 12, 28 (excerpts located at Doc. 68, Ex. M; full deposition at Doc. 72, Ex. G).  However, that is a matter for the jury at trial.

whether it appears to be a boot print.  While it may be hard to imagine how a readily identifiable boot print could be left on the groin area, that issue goes to the weight of the evidence and not to its admissibility.  The defendants' motion to strike is therefore due to be denied as to this statement.

With regard to the second statement, about the plaintiff's ability to walk, the defendants contend that Wilkerson is not a medical professional and does not explain what expertise, training, or special knowledge he has to permit him to conclude that the plaintiff could hardly walk.  (Doc. 76 at p. 13).  Again, no special medical training is needed to merely observe whether the plaintiff is ambulating in a manner different than he usually does.  Wilkerson states in his affidavit that he knew the plaintiff and that he had been at his home immediately before the incident.  His observation of how the plaintiff ambulated after the incident is simply his observation of a change in circumstances.  The defendants' motion to strike as to this statement is due to be denied.

In regard to the third statement, that the plaintiff was afraid, frightened, and scared, the defendants contend that Wilkerson lacks the training and special knowledge to reach such a conclusion.  (Doc. 76 at p. 13).  In Wilkerson's affidavit, he states that the plaintiff told him that he was "afraid for his own safety."  (Doc. 72, Ex. N).  The court finds that this statement is an exception to the hearsay rule under Rule 803(3) because it is "a statement of the declarant's existing state of mind, emotion, sensation, or physical condition."  FED. R. EVID. 803(3).  Additionally, there is nothing that precludes Wilkerson from articulating his personal observations of the plaintiff's condition at that juncture.  Medical or psychological training is not

required under the present circumstances.[22]

In regard to the last statement, that it took the plaintiff two weeks to recover, the defendants assert he lacks the requisite special knowledge to testify to the same. (Doc. 76 at p. 13). Although Wilkerson worked with the plaintiff (Wilkerson Dep. at p. 13), and most likely would have known when the plaintiff returned to work, Wilkerson offers no evidence showing that the entire time that the plaintiff was off work was required for his injuries to heal. The statement is therefore due to be struck.

### 4. Contradictory Statements

The defendants assert that the testimony of Wilkerson claiming to have seen the imprint of a boot on the plaintiff's groin is in direct contradiction to the affidavit and deposition testimony of Endfinger and should be considered as a sham and struck. (Doc. 76 at p. 13). Endfinger did not state in his deposition or affidavit that the plaintiff was not injured in his groin area. In fact, he did not mention the groin injury at all in his affidavit. He merely stated in his deposition that he did not recall examining the groin area. (Endfinger Dep. at p. 22). He also stated that the plaintiff "apparently didn't mention to me or to the nurse, that I can see, any type of groin injury." (*Id.*). Wilkerson's statement is not so contradictory to the testimony of Endfinger to warrant that it be struck. The defendants' motion to strike is due to be denied in this regard.

### F. Witness Statement of Donnie Ray Key Taken by Deputy Sheriff James Painter on February 4, 2002 (Exhibit O)

The defendants assert that the statement of the plaintiff taken by Deputy Sheriff James

---

[22]It is also worth noting at this juncture that Wilkerson was able to observe the plaintiff's physical and mental condition shortly before the event in question.

Painter while investigating the events surrounding the arrest of the plaintiff (doc. 72, ex. O) is

due to be stricken because it is hearsay that does not fall within any exception to the hearsay rule.

(Doc. 76 at p. 14).  The plaintiff again asserts in his response to the defendants' motion for

summary judgment that this statement, even if hearsay, would qualify as an exception to the

hearsay rule because it is either a "present sense impression" or an "excited utterance" as defined

by Rule 803(1) and (2).  (Doc. 71 at p. 16).  Because the statement was made at least two days

after the incident in question, the court cannot find that it fits within one of the enumerated

exceptions.[23]

### III.  MOTION FOR SUMMARY JUDGMENT

#### A.  Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the declarations, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct.

2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial.  Only when that burden has been met does the burden

shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that

precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.

---

[23]It is well-settled that when police reports contain witness statements, and the witness statements are offered to prove
the truth of the matters asserted therein, the statements are generally inadmissable.  *Jacobs v. City of Port Neches*, 7 F. Supp. 2d
829, 835 (E.D. Tex. 1998) (citing *Ariza v. City of New York*, 139 F.3d 132, 133-34 (2d Cir. 1998) (witness statements in police
investigative report inadmissible as business record)); *United States v. Dotson*, 821 F.2d 1034, 1035-36 (5th Cir. 1987) (holding
that witness statements in police report inadmissible); *United States v. Halperin*, 441 F.2d 612, 618-19 (5th Cir. 1971)
(investigative report not admissible as public record under 803(8)).

1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by. . .affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### B.  Fourth Amendment Violation

The plaintiff asserts that the defendants violated his Fourth Amendment rights when they used excessive force during his arrest.  (Complaint at ¶ 19).  The defendants contend that summary judgment is due to be granted them because: (1) there is no evidence of excessive force

31

as alleged in the plaintiff's complaint and (2) the force that was used was, according to the

evidence of the facts and circumstances, reasonable as a matter of law.  (Doc. 66).

The Fourth Amendment guarantees freedom from "unlawful searches and seizures."

Force, however, is frequently required to secure an arrest.  The issue before the court is whether

the conduct in this case is such that it can conclude as a matter of law that the force used was

appropriate.  The answer depends on the surrounding circumstances at the time of the arrest.

The Eleventh Circuit Court of Appeals in *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004),

provides the following direction in resolving this matter:

> "The Fourth Amendment's freedom from unreasonable searches and
> seizures encompasses the plain right to be free from the use of excessive force in
> the course of an arrest."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (citing *Graham v.
> Connor*, 490 U.S. 386, 394-395, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443
> (1989)).  A court looks to the "totality of circumstances" to determine whether the
> manner of arrest was reasonable.  *See Tennessee v. Garner*, 471 U.S. 1, 8-9, 105
> S. Ct. 1694, 1700, 85 L. Ed. 2d 1 (1985).  "[I]n determining if force was
> reasonable, courts must examine (1) the need for the application of force, (2) the
> relationship between the need and amount of force used, and (3) the extent of the
> injury inflicted."  *Lee*, 284 F.3d at 1198 (citing *Leslie v. Ingram*, 786 F.2d 1533,
> 1536 (11th Cir. 1986)); *see also Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th
> Cir.  2002).  It is well settled that the right to make an arrest "necessarily carries
> with it the right to use some degree of physical coercion or threat thereof to effect
> it."  *Graham*, 490 U.S. at 396, 109 S. Ct. at 1871-72; *Vinyard*, 311 F.3d at 1347;
> *Lee*, 284 F.3d at 1197.  Moreover, "[t]he calculus of reasonableness must embody
> allowance for the fact that police officers are often forced to make split-second
> judgments--in circumstances that are tense, uncertain, and rapidly evolving--about
> the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S.
> at 396-97, 109 S. Ct. at 1872.

*Draper*, 369 F.3d at 1277-78 (footnotes omitted).  "*Graham* dictates unambiguously that the

force used by a police officer in carrying out an arrest must be reasonably proportionate to the

need for that force, which is measured by the severity of the crime, the danger to the officer, and

the risk of flight." *Lee*, 284 F.3d at 1198.[24]

## 1. No Evidence of Excessive Force

The defendants first assert that summary judgment is due to be granted them on all counts because the plaintiff has failed to adduce any admissible evidence to support a claim against the defendants.  (Doc. 67 at p. 13).  The plaintiff contends that summary judgment is due to be denied because "[t]here are several admissible material facts that bear discussion in plaintiff [sic] response.  Plaintiff suffered severe injuries at the roadblock incident.  He sought treatment at several hospitals for his injuries.  One [sic] injury was a broken nose and a kick to the groin area."  (Doc. 71 at p. 12).

This case is unusual in that the plaintiff died before he was deposed.[25]  Accordingly, the plaintiff's counsel offers other evidence in support of his case, including: (1) the deposition testimony and affidavits of family members who state what the plaintiff told them concerning the incident in question and their observations of him after the fact; (2) statements made by the plaintiff to hospital personnel; and, (3) his statement made two days after the incident to Deputy Painter who was investigating the allegations.[26]  (Doc. 72, Ex. K-O).

As has already been discussed, none of the family members who submitted depositions or affidavits were present at the roadblock or at the scene of the arrest and therefore have no first-hand knowledge of the incident in question.  (See Bill Key Dep. at p. 42; Joyce Key Dep. at

---

[24]In his response to the motion for summary judgment, the plaintiff states that he "would revisit and briefly lodge their [sic] objection to the court's prior memorandum order that **ignored** the illegal road block argument."  (Doc. 70 at pp. 4-5) (bold added).  Contrary to the plaintiff's assertion, the court did not ignore the claim concerning the roadblock.  (See Doc. 19 at pp. 9-10).  Instead, the court specifically addressed the claim and granted the motion to dismiss the same.

[25]The exact cause of the plaintiff's death is unknown, but there is no evidence it is related to this matter.

[26]This is in addition to the depositions of the defendants and the testimony from the plaintiff's criminal trial.  (See Doc. 72).

p. 47; Wilkerson Dep. at p. 66; Jerry Key Dep. at p. 34).  Much of the testimony concerning the

roadblock, the pursuit, or the subsequent arrest of the plaintiff that tends to favor the plaintiff is

based on what the plaintiff told others, thus limiting the admissible evidence.  *Id*.

What is not disputed is that the plaintiff approached a traffic stop being conducted by

officers of the Walker County Sheriff's Department.  Present at the stop were various Walker

County deputies and reserve deputies.  The plaintiff approached the location and failed to stop.

After he went through the location, numerous deputies pursued him.  Within approximately three

miles, the vehicle the plaintiff was driving was stopped.  The plaintiff was forcibly removed from

the car through the driver's window by Deputies Hogan, Hood, and Holcomb (Hogan Tr. at p.

12; Hood Tr. at p. 56; Holcomb Dep. at pp. 14-16) and was taken to the pavement and cuffed by

Deputy Bridges.[27]  (Bridges Tr. at pp. 78-95).  Williams witnessed the plaintiff being removed

from the car and assisted in holding his legs.  (Williams Dep. at p. 9).[28]  The plaintiff received

various physical injuries from the encounter.  He was taken to the jail where he was picked up by

his brother-in-law, James Wilkerson, approximately two and one-half hours later.

When he was driving to the hospital with Wilkerson, he told him that the deputies "drug

him out of his car through a partially closed window, then stomped him and beat him.  They

handcuffed him and knocked him to the ground.  They kicked him in the groin area and dared

him to get up." (Wilkerson Aff. at ¶ 6).  Wilkerson states that he saw the "imprint of a boot on

the skin of [the plaintiff's] groin area." (*Id*.).  He further states that the plaintiff informed him

---

[27]Deputy Hood also testified that he believed he was able to cuff the plaintiff's right wrist, but he was not sure.  (Hood Tr. at p. 65).  (The references to "Tr." are to the transcript from the criminal trial found at document 72, exhibits A-1, -2 & -3.  Holcomb's deposition is located at document 68, exhibit H).

[28]Excerpts from Williams' deposition are located at document 68, exhibit G.

"that two of the deputies involved told him to forget it . . . and they would not proceed with charges against him." (*Id.* at ¶ 7). Lastly, he states that the plaintiff was fearful for his safety "because the two deputies indicated that [he should] 'let it go, or they would catch him soon or later again." (*Id.* at ¶ 8). Wilkerson took the plaintiff to the hospital for treatment of his injuries. His treating physician described his injuries as including a "broken nose, a busted lip, a left ankle sprain, an abrasion to the head, swelling behind . . . one of his ears, chest pain, and bruses [sic] from[,] as he reported[,] being beaten and assaulted by the Walker County Sheriff['s] Department deputies." (Endfinger Aff. at ¶ 4).

The plaintiff's parents, Bill Key, Jr., and Joyce Key, testified that they were in Greene County the night of the incident in question and did not return home until sometime the next day. (Joyce Key Dep. at p. 23). It was then that they observed his injuries.

The plaintiff was taken to Cooper Green Hospital in Birmingham, Alabama, that evening. He reported to the emergency room staff that he was assaulted by six police officers. (Doc. 68, Ex. P).[29]

Premised on the foregoing summary of the evidence, the court cannot conclude as a matter of law that there is no evidence of excessive force. Viewing the foregoing testimony along with the photographic and medical evidence before the court, the court finds that there is enough to overcome the defendants' motion for summary judgment as to defendants Hogan, Hood, Holcomb, Williams, and Bridges. However, the court does not find sufficient evidence to

---

[29]The defendants assert that the plaintiff did not answer their "Requests for Admissions" submitted on May 5, 2002, and therefore the statements should be deemed "conclusively established" in accordance with FEDERAL RULE OF CIVIL PROCEDURE 36. (Doc. 67 at p. 17). The plaintiff's counsel, however, contends that he responded to their requests on June 3, 2005. (Doc. 71 at p. 9). He has submitted a copy of his answer in his submission of evidentiary material included with his reply to the defendants' motion for summary judgment. Under the circumstances, this court cannot find that the responses were not sent for them to be treated as admissions that are "conclusively established."

overcome the motion as to defendants Terry, Mote, Wright, and Knowles.

Deputy Terry stated in his deposition that he arrived on the scene after the plaintiff had been put in the back of a patrol car and that he did not see the plaintiff get out or anyone else get in the backseat with the plaintiff.  (Terry Dep. at p. 12).[30]  Deputy Mote, who rode with Terry, testified that the plaintiff was already in the back of a patrol car when he arrived.  (Mote Dep. at p. 14; Terry Dep. at p. 12).[31]  He did see the plaintiff get out of the patrol car and apologize to the deputies.  (*Id*.).  Deputy Wright recalled arriving after the plaintiff had been placed in the back of the patrol car.  (Wright Dep. at p. 13).[32]  Deputy Knowles stated that he was not on duty the night in question and was neither present at the roadblock or at the arrest scene.  (Knowles Dep. at p. 9).[33]  The plaintiff has offered nothing to contradict this evidence.  Summary judgment is therefore due to be granted as to these defendants.

## 2.  The Force Used Was Reasonable as a Matter of Law

The defendants next assert that the force that was used in this instance was reasonable as a matter of law.  (Doc. 67 at p. 19).  In order to prevail on a motion for summary judgment, the defendants must show that there is undisputed evidence that (1) there was a need for the application of force, (2) there was a relationship between the need and the amount of force used, and (3) the extent of injury was proportional to the amount of force required.  *Lee*, 284 F.3d at 1198.

---

[30]Terry's deposition excerpts are located at document 68, exhibit J.

[31]Mote's deposition excerpts are located at document 68, exhibit C.

[32]Wright's deposition excerpts are located at document 68, exhibit I.

[33]Knowles' deposition excerpts are located at document 68, exhibit L.

As just noted, it is undisputed that the plaintiff failed to stop at the checkpoint where the deputies were conducting license checks; that the deputies pursued the plaintiff; and, that, once he stopped, the plaintiff failed to get out of his car, even when requested to do so by the deputies. (Complaint at p. 3; Hogan Dep. at p. 7; Parr Dep. at p. 17).  Because the plaintiff would not respond to the officers' commands, for whatever reason, the use of force to extricate him from the car was necessary.[34]  Therefore, the relevant inquiry concerns the amount of force used and the resulting injuries inflicted to effectuate his arrest.

The defendants cite *Draper* in support of their argument that the force used was reasonable as a matter of law, noting that the situation in *Draper* is analogous to this case because both plaintiffs were "hostile, belligerent and uncooperative."  (Doc. 67 at p. 19).  The defendants further assert that the plaintiff in this case "ignored countless authoritative verbal commands, had refused to exit his vehicle, and when he did exit jerked away and swatted at the officers."  (*Id.*).

The court finds that the instant case is factually distinguishable from *Draper*.  The officer in *Draper* "tasered" the plaintiff and brought him under control when he was uncooperative.  The *Draper* court stated that "[a]lthough being struck by a taser gun is an unpleasant experience, the amount of force" was reasonably proportionate to the need and did not inflict any serious injury.[35] In the instant case, the plaintiff suffered serious bodily injury from being struck - the degree of

---

[34]"[T]he need for the application of force is measured by this test: 'the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.'"  *Lee*, 284 F.3d at 1198 (interpreting *Graham*).  In the present case, the plaintiff failed to stop, attempted to elude the officers, and failed to obey lawful commands.  Application of force was the next reasonably necessary step.  This is particularly true since it was at night and the officers did not know whether the plaintiff was armed.

[35]The *Draper* court further noted that the plaintiff was seen "standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him."  *Draper*, 369 F.3d at 1278.

which is disputed by the parties.

The defendants also cite *O'Neil v. Dekalb County, GA*, 850 F.2d 653, 656 (11th Cir. 1988), in support of their contention that "there is no constitutional requirement that police officers must 'use the minimum [amount] of force to apprehend a violent and dangerous suspect who is threatening the lives of the officers and others.'" The court agrees with that proposition of law, however, it further finds the facts of *O'Neil* distinguishable from the present situation. In *O'Neil*, the suspect threatened the officers with deadly force when he challenged them with a knife. The officers responded with deadly force when the suspect was shot twice. In the present case, there is no evidence that the plaintiff was armed. The evidence indicates the contrary. He was, however, noncompliant in a situation that law enforcement officers are trained to expect may escalate at any moment. The fact that the plaintiff made no aggressive moves after being stopped does not change the dangerousness of the situation, but it is distinguishable from *O'Neil*.

There exists a factual dispute as to what happened once the plaintiff was pulled from his car. Wilkerson stated that the plaintiff told him the following:

> He told me that they drug him out of his car, drug him through the window. They stomped him, they beat him. They beat him nearly unconscious. He got up and they handcuffed him, dared him to raise up. They beat him some more and knocked him on the ground. They stomped him. They stomped in his groin area, his back, his shoulders, and he said he thought he was going to die is what he told me.

(Wilkerson Dep. at p. 38). He also told medical personnel that he was assaulted and beaten. He also had appreciable physical injuries supporting his version of the events. Contrary to this, the defendants assert a significantly different version of the events that night. Deputy Hogan states in his deposition as follows:

Q.  Did you see any of the officers hit Mr. Key?

A.  No, sir.

Q.  Did you hit Mr. Key?

A.  No, sir.

Q.  Did you see anyone kick Mr. Key?

A.  No, sir.

(Hogan Dep. at p. 15).  Deputy Bridges testified:

Q.  Did you see any of your deputies hit Mr. Key?

A.  No.

Q.  Did you see any of your deputies punch Mr. Key?

A.  No.

(Bridges Dep. at p. 16).  Deputy Holcomb testified:

A.  Deputy Hood and Deputy Hogan were assisting me too - or they were trying to cuff him and I was helping them cuff him.  Deputy Williams was holding his legs down because he was kicking and fighting us.

Q.  Did you see any other officers who was [were] holding on to him punch him?

A.  No, sir.

Q.  Did you see anybody there punch or kick Mr. Key?

A.  No, sir.

Q.  Did you see anyone stomp him?

A.  No, sir.

(Holcomb Dep. at pp. 15-16).  Deputy Terry testified:

Q.  Did you ever see anyone at the scene of the stop punch Mr. Key?

A.  No, sir.

Q.  Did you ever see anyone kick him?

A.  No, sir.

Q.  Did you ever see anyone stomp him?

A. See anyone what?

Q.  Stomp.

A.  No.

(Terry Dep. at pp. 16-17).  Deputy Williams testified:

Q.  Did you see anyone punch Mr. Key?

A.  No.

Q.  Did you see anyone kick him?

A.  No.

(Williams Dep. at p. 17).

What occurred at the time the plaintiff was removed from the car is disputed.  Since the statements of the plaintiff to Wilkerson and the medical personnel are directly contradicted by the testimony of the deputies, the court finds that a factual dispute precludes the granting of the defendants' motion for summary judgment on behalf of the deputies involved in the takedown of the plaintiff.

### 3.  Qualified Immunity

### a.  Generally

The defendants next assert that even if this court finds a factual dispute exists as to whether the defendants' use of force was reasonable, the defendants are nonetheless entitled to

40

qualified immunity on the plaintiff's excessive force claim.  (Doc. 67 at p. 21).  The plaintiff disagrees.

Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Bashir v. Rockdale County, GA*, 455 F.3d 1323, 1327 (11th Cir. 2006) (citing *Lee*, 284 F.3d at 1193-94); *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee*, 284 F.3d at 1194 (citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S. Ct. 3034, 3038, 97 L. Ed. 523 (1987)).  In order to qualify for the protection of qualified immunity, the public official "must prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id*. (citing *Courson v. McMillan*, 939 F.2d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988)).  Once a defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Id*.  The Supreme Court has set forth a two-part test for the qualified immunity analysis. *Bashir*, 455 F.3d at 1323.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Vinyard*, 311 F.3d at 1346 (quoting *Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 2513, 153 L. Ed. 2d 666 (2002) & (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151,

41

150 L. Ed. 2d 272 (2001)).  If the threshold question is answered in the affirmative, the second

question to be asked is "whether the right was clearly established." *Saucier*, 533 U.S. at 201, 121

S. Ct. 1251; *Bashir*, 455 F.3d at 1327.

There is no question that the defendants were acting within their discretionary authority

as deputies of the Walker County Sheriff's Department when the purported wrongful acts

occurred.  The deputies were acting under Sheriff Tirey in setting up the checkpoint.  They were

also acting within their discretionary authority in pursuing, stopping, and arresting anyone who

failed to stop at that location.  Accordingly, the next question is whether the plaintiff's

allegations, if true, amount to a constitutional deprivation.

### b.  Constitutional Deprivation

The court in *Vinyard* stated the proper analysis for determining whether a constitutional

violation has occurred is as follows:

> To balance the necessity of the use of force used against the arrestee's
> constitutional rights, a court must evaluate several factors, including "the severity
> of the crime at issue, whether the suspect poses an immediate threat to the safety
> of the officers or others, and whether he is actively resisting arrest or attempting to
> evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S. Ct. 1865; *see also Lee*,
> 284 F.3d at 1197-98 (citing *Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th Cir.
> 1986) and stating that "in determining if force was reasonable, courts must
> examine (1) the need for the application of force, (2) the relationship between the
> need and amount of force used, and (3) the extent of the injury inflicted")
> (footnote omitted).  As this Court also recently explained in *Lee*, "*Graham*
> dictates unambiguously that the force used by a police officer in carrying out an
> arrest must be reasonably proportionate to the need for that force, which is
> measured by the severity of the crime, the danger to the officer, and the risk of
> flight." *Lee*, 284 F.3d at 1198.

*Vinyard*, 311 F.3d at 1347.  The Supreme Court in *Saucier* stated that the initial inquiry is

whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts show

42

the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201.

In reviewing this aspect of the case, the court must analyze the facts in the light most favorable to the plaintiff. Accordingly, the evidence tends to show that after the plaintiff ran the checkpoint, he pulled over on his own volition.[36] (Wilkerson Dep. at p. 38). When the deputies approached the car, the plaintiff was merely sitting in his car. Although it is undisputed that he ignored the deputies demands to get out of the car, he was not confrontational with the deputies. He was also unarmed.[37] The plaintiff states that he rolled down his window and placed his hands out of the car just before the deputies grabbed him and pulled him from the car through the window space. (Wilkerson Dep. at pp. 38-39). According to the plaintiff's version, once he was removed from the car, the deputies "stomped" on and beat him, almost to the point of unconsciousness. (*Id.*). Once he was handcuffed, the deputies "knocked" him back to the ground and continued to beat and "stomp" on him, including kicking his groin, back, and shoulders. (*Id.*).

As stated earlier, the plaintiff's refusal to obey the deputies' commands to exit the vehicle required the use of force to remove the plaintiff from the car. The disputed question, however, is whether the force used to remove the plaintiff and the force used on the plaintiff once removed from the car was excessive in violation of his constitutional rights. This court finds, after weighing the facts in the light most favorable to the plaintiff, that the purported conduct of the officers in striking and "stomping" the plaintiff, particularly after he was handcuffed is sufficient to overcome the defendants' motion for summary judgment. Such conduct could

---

[36]As with many of the facts in this case, this one is contested by the defendants.

[37]The deputies, however, had no way of knowing this at that time.

43

amount to a constitutional violation.

### c. "Clearly Established"

Because the defendants' conduct arguably violated the plaintiff's Fourth Amendment rights, the next question is whether that constitutional right was clearly established at the time of the incident so as to apply to the present situation.  The Supreme Court in *Saucier* stated that "[i]f the law did not put the officer *on notice* that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Saucier*, 533 U.S. at 201, 121 S. Ct. 1251.  The Supreme Court reiterated in *Hope* that "the salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their alleged treatment of [the plaintiff] was unconstitutional."  *Hope*, 536 U.S. at 739-40, 122 S. Ct. at 2515-16.

A public official is charged with fair notice of whether particular conduct is unconstitutional in three ways.  First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity even in the total absence of case law.  *Vinyard*, 311 F.3d at 1350.  The court in *Vinyard* further explained, "[f]or example, the federal statute or the federal constitutional provision may be so clear, or the conduct so bad, that case law is not needed to establish that the conduct cannot be lawful."  *Id*.  The court in *Vinyard* listed several cases as examples:

> In excessive force cases in the Fourth Amendment context, this Court has sometimes considered "obvious clarity" cases as involving conduct "far beyond the hazy border between excessive and acceptable force."  Our "hazy border" decisions concluded the law was clearly established that the force involved was excessive in the absence of any case law (first type of "obvious clarity" notice).  *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (concluding

law was clearly established and force was "clearly-excessive-even-in-absence-of-
case-law" when officer released police dog to attack plaintiff who was lying on
the ground, did not pose a threat to officers or to anyone else, and was not
attempting to flee or resist arrest); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th
Cir. 2000) (concluding, without case law on point, that the evidence, if credited,
suggested "the officers used excessive force in beating Slicker even though he was
handcuffed and did not resist, attempt to flee, or struggle with the officers in any
way"); *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997) (concluding
officer's conduct was "far beyond the hazy border" and unlawfulness was "readily
apparent even without clarifying caselaw" when officer, while on plaintiff's back
and handcuffing him, broke plaintiff's arm requiring surgery for multiple fractures
even though plaintiff at the time was offering no resistance at all); *see also Lee v.
Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (concluding "[a]s in *Slicker*,
*Priester*, and *Smith*, the peculiar facts of this case are 'so far beyond the hazy
border between excessive and acceptable force that [the officer] had to know he
was violating the Constitution even without caselaw on point'") (quoting *Smith*,
127 F.3d at 1419).

*Vineyard*, 311 F.3d at 1350 n.18.

Second, if the conduct is not so bad as to violate the statute or constitutional provision on

its face, the next step is to look to case law in which broad statements of principle that are "not

tied to particularized facts and can clearly establish law applicable in the future to different sets

of detailed facts" are made. *Vinyard*, 311 F.3d at 1351 (citing *Marsh v. Butler County*, 268 F.3d

1014, 1031-32 (11th Cir. 2001). If a broad principle in case law is to be used as a warning, it

may do so only as long as it does so with "obvious clarity" to the point that "every objectively

reasonable governmental official facing the circumstances would know that the official's conduct

did violate federal law when the official acted." *Id*.

Third, if no broad statement of principle is available, the court must look to precedent that

is tied to particular facts. The Eleventh Circuit in *Vinyard* described this method as follows:

> . . . . That is, we look for cases in which the Supreme Court or we, or the
> pertinent state supreme court[ ] has said that "Y Conduct" is unconstitutional in
> "Z Circumstances."  We believe that most judicial precedents are tied to

particularized facts and fall into this category.  When we have written of the circumstances of two cases as being materially different, we are saying the same thing for which the Supreme Court--and sometimes this Court--has used a different phrase: "distinguishable in a fair way," in *Saucier*, 533 U.S. at 202, 121 S. Ct. 2151, [ ] and "fairly distinguishable," in *Pace v. Capobianco*, 283 F.3d 1275, 1283 (11th Cir. 2002).  When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.  On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard*, 311 F. 3d at 1351-52 (footnotes omitted).  The court further stated:

For the third type of notice or warning, the Supreme Court in *Hope* explained that "[i]n some circumstances . . . a very high degree of prior factual particularity may be necessary."  122 S. Ct. at 2516 (quoting *Lanier*, 520 U.S. at 270-71, 117 S. Ct. 1219).  Indeed, *Hope* also reaffirmed the well-established rule that for a constitutional right to be clearly established, "its contours 'must be sufficiently clear'" and "in the light of pre-existing law the unlawfulness must be apparent," stating:

> For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell v. Forsyth*, 472 U.S. 511, 535, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Id*. at 2515 (alteration in original) (internal quotation marks omitted).[ ]

*Vinyard*, 311 F.3d at 1353 (footnotes omitted).

In response to the defendants' assertion that they are entitled to qualified immunity under the circumstances, the plaintiff asserts that they are not because the evidence shows that "Key was handcuffed while on the ground.  His hands were behind his back and his feet secured.  Yet

his head was bashed, his chest was sore and bruised, because someone either sat or laid on him to help keep him down.  Also his lip [was] busted, his teeth chipped, and his nose broken." (Doc. 71 at p. 22).  In support of his contentions, the plaintiff cites *Lee*.  The defendants counter as follows:

> The Plaintiff admits that there are no factually similar cases that would provide the Defendants with fair warning that their conduct was unlawful. (Plaintiff's Brief in Opposition, p. 15).  As pointed out in Defendants' initial brief, all of the Eleventh Circuit's obvious clarity cases in the excessive force context involve a serious injury inflicted **after** the arrestee has been subdued, and either has been handcuffed or is in the process of being handcuffed.[ ]  The undisputed *evidence* in this case shows that [t]he officers on the scene used only necessary, minimal, and reasonable force while attempting to subdue and handcuff the Plaintiff.  Once he was subdued, all force ceased.  The Plaintiff cannot allege that force was used after the Plaintiff was handcuffed without citing admissible evidence to support this allegation.  Because, by the Plaintiff's own admission, there are no factually similar cases where the Court found that excessive force was used, and because there is no evidence that this case fits into the class of obvious clarity cases, the Defendants are entitled to qualified immunity.

(Doc. 73 at p. 7 (footnote omitted) (emphasis in original)).

The evidence in this action, particularly that the plaintiff was assaulted after he was handcuffed, is sufficient to place this case in the "obvious clarity" situation.  Accepting the plaintiff's allegations and evidence, the court finds that the defendants' conduct is "far beyond that hazy border" discussed by the appellate courts.  The unlawfulness of striking and "stomping" the plaintiff after he was handcuffed should have been readily apparent to the deputies.

Even if the court were to accept the premise that the deputies were not on notice that such conduct was prohibited by the Fourth Amendment, pre-existing, binding case law provided the deputies fair notice that the conduct they engaged in was unlawful.  The defendants are correct in asserting that *Lee* did not put them on notice because it was decided after this incident and that

47

there is no prior case law with exactly the same facts as those presented in this case.  (Doc. 67 at

p. 23).  However, following the direction of *Hope* and *Vinyard*, the court finds that then existing

case law provided the defendants with fair notice that a reasonable official would understand that

their conduct violated the law.

As just noted, the plaintiff cites *Lee* as an example of prior case law which would have

given the defendants fair notice that the conduct violated his constitutional rights.  (Doc. 71 at p.

22).  Although the timing precludes such a finding, *Lee* is instructive.  The Eleventh Circuit held

that an officer violated the plaintiff's Fourth Amendment rights when he slammed her head into

the trunk of the car after she had been subdued for a minor traffic offense.  The court stated that

"[i]n reaching our decision, we are applying the clear and obvious principle that once an arrest

has been fully secured and any potential danger or risk of flight vitiated, a police officer cannot

employ the severe and unnecessary force allegedly used here."  *Lee*, 284 F.3d at 1200.  The court

further stated:

> We recognized this principle in *Slicker v. Jackson*, 215 F.3d 1225 (11th
> Cir. 2000), where we denied qualified immunity to police officers who arrested
> the plaintiff for disorderly conduct, placed him in handcuffs, and then, after he
> had been fully secured, slammed his head into the pavement and kicked him in the
> leg, head, and back.  *See id.* at 1227.  In reaching our decision in *Slicker*, we
> explained that the evidence taken in the light most favorable to the plaintiff was
> "sufficient to raise a question of fact as to whether the officers' actions constituted
> excessive and not de minimis force."  *Id.* at 1233.  *See also Priester*, 208 F.3d at
> 926-27 (denying qualified immunity in light of clearly excessive force to officer
> who allowed police dog to attack arrestee who was already subdued and lying on
> the ground); *Smith*, 127 F.3d at 1418-20 (denying qualified immunity in excessive
> force case to officer who broke arm of individual who "docilely submitted" to
> officer's request to "get down").  As in *Slicker*, *Priester*, and *Smith*, the peculiar
> facts of this case are "so far beyond the hazy border between excessive and
> acceptable force that [the officer] had to know he was violating the Constitution
> even without caselaw on point."  *Smith*, 127 F.3d at 1419.

48

*Lee*, 284 F.3d at 1199.

Again, viewing the facts in a light most favorable to the plaintiff, the defendants continued to exert severe force even after the plaintiff was handcuffed and no longer a threat. Therefore, since the defendants were on notice that the use of such force after the plaintiff was subdued was unlawful, the defendants' assertion of qualified immunity is due to be denied.[38]

### 4.  Use of Force Was de minimus

The defendants next assert that the deputies did not violate the plaintiff's constitutional rights and are entitled to qualified immunity because any use of force was de minimus.  (Doc. 67 at p. 25; Doc. 73 at p. 8).  The defendants cite various cases in support of this contention, including the following: *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (force was de minimus where officers "forced Durruthy down to the ground and plac[ed] him in handcuffs"); *Nolan v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000) (force de minimus when officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searching his groin area in an uncomfortable manner, and handcuffed him"); *Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir. 1997) (force was de minimus when officers, knowing the plaintiff had recently suffered a stroke, "'slammed' his head against the wall, kicked his legs apart, required him to raise his arms above his head, and pulled his wallet from his pants," causing the plaintiff to

---

[38]The defendants attempt to distinguish the foregoing cases premised on the fact that they involve injuries after the arrestee was subdued and either was cuffed or was in the process of being cuffed.  (Doc. 73 at p. 7 & n.6).  However, this ignores the responsibility of the court to view the evidence in a light most favorable to the plaintiff at this juncture.

experience pain).[39]

The defendants assert that since qualified immunity was held to apply in the foregoing cases, the actions of the deputies in the instant case is similar and therefore protected by qualified immunity.  The defendants further argue that the nature of the alleged injuries, the situation confronting the deputies, and the minimal force they used all compel the conclusion that any force was de minimus.  The above-cited cases are distinguishable from the present situation.  The use of force in this case is alleged to have continued after the plaintiff was handcuffed.  This is not the situation in any of the cited cases cited by the defendants where the use of force ceased upon restraint of the suspects.  The amount and type of force used in the instant case is also distinguishable from the cited cases.  In the instant case, the officers allegedly "stomped" and beat the plaintiff while purportedly taunting him to get up.  (Wilkerson Dep. at p. 38).  Therefore, the motion is due to be denied on this basis as well.

### 5.  Plaintiff's Failure to Specify Which Deputies Participated in the Beating

The defendants lastly assert in their reply to the plaintiff's brief in opposition to the motion for summary judgment that the plaintiff's failure to specify in his allegations which deputies did which act or which deputies were actually at the scene when any alleged force took place constitute conclusory allegations and are insufficient to create a genuine issue of material fact.  (Doc. 73 at pp. 3-4).  Because this matter was raised in the reply brief, the plaintiff did not have an opportunity to respond to the same.

In *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1441 (11th Cir. 1985), a § 1983 claim

---

[39]The plaintiff cites *Alexis v. McDonald's*, 67 F.3d 341 (1st Cir. 1995) and *Knight v. Caldwell*, 970 F.2d 1430 (5th Cir. 1992), in support of the proposition that the court "consider the fact that excessive force claims are not precluded because only minor injuries are alleged."  (Doc. 71 at p. 14).  The court does not find these non-binding precedents helpful.

was brought against a number of officers that were present when excessive force was used in the

arrest of the plaintiff.  The trial court dismissed the matter prior to completion of the discovery

process.  On appeal, the Eleventh Circuit held that dismissal was improper even though the

plaintiff could not identify which officers in particular were responsible for the excessive force.

The court further stated:

> . . . .  It is not necessary that a police officer actually participate in the use
> of excessive force in order to be held liable under section 1983.  Rather, an officer
> who is present at the scene and who fails to take reasonable steps to protect the
> victim of another officer's use of excessive force, can be held liable for his
> nonfeasance. . . .

*Fundiller*, 777 F.2d at 1441-42 (citations omitted).  Although the instant case is at the summary

judgment stage after all the discovery has been completed, the court finds *Fundiller* instructive.

To avoid summary judgment, the plaintiff must show that excessive force was used against him

during his arrest, that the named deputies were present at the scene, and that each either

participated in the unlawful assault or at least observed the use of excessive force and did not

intervene.  *See Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000); *Riley

v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996).

Again, reviewing the facts in this case in a light most favorable to the plaintiff, the

evidence shows that deputies Hogan, Hood, Holcomb, Bridges, and Williams actually

participated in the removal, cuffing, and subduing of the plaintiff.  To the extent the plaintiff

alleges other deputies "stood idly by and did nothing" while the "abusive conduct" took place

(doc. 30 at p. 1), the evidence shows that defendants Terry, Mote, and Wright arrived after the

plaintiff was cuffed and in the back seat of the car and Knowles was not working that evening.

Other than the trial and deposition testimony from the deputies, the plaintiff has offered

51

no other admissible evidence indicating which specific deputies either participated in the use of excessive force or observed the same and failed to intervene.  From the admissible evidence it is clear that Deputies Hogan, Hood, Holcomb, and Bridges were there and actually participated in the arrest.  Construing the facts in a light most favorable to the plaintiff, the plaintiff was beaten even after he was handcuffed.  (Wilkerson Dep. at p. 38).  Additionally, Williams was present and participated in the events or failed to intervene.  Therefore, this court cannot find that summary judgment is due to be granted at this juncture.  As for deputies Terry, Mote, Wright, and Knowles, there is no evidence to show that they participated in the use of excessive force or observed the use of excessive force with the opportunity to intervene.  Summary judgment is therefore due to be granted as to them.

### 6.  Failure to Protect Claim

The plaintiff, in his brief in opposition to the defendants' motion for summary judgment states: "However, please note that the defendants in it's initial brief have not advanced any arguments against or made any defensive denial of plaintiff [sic] claims of 'failure to protect.'" (Doc. 71 at p. 17).  The defendants reply that the plaintiff has not met his burden with regard to the failure to protect claim.  (Doc. 73 at p. 7).  For the reasons stated previously, the court finds that the defendants' motion to the extent it seeks a judgment on the failure to protect claim, is due to be denied.[40]

### CONCLUSION

The motion to strike is to be denied in part and granted in part as stated above.  Summary

---

[40]Any failure to protect claim appears most applicable to Williams who was present and only assisted in the restraint of the plaintiff.

judgment is due to be granted as to defendants Terry, Mote, Wright, and Knowles and denied as to defendants Hogan, Hood, Holcomb, Williams, and Bridges.  An appropriate order will be entered.

      **DONE,** this the 19th day of June, 2006.

                                       *John E. Ott*

                                       JOHN E. OTT
                                   United States Magistrate Judge